TARA K. MCGRATH
United States Attorney
MICHAEL G. WHEAT
ASHLEY KAINO-ALLEN
Assistant U.S. Attorneys
CA and TX Bar Nos. 118598/24099412
880 Front Street, Room 6293
San Diego, California 92101-8893
(619) 546-8437/8835
michael.wheat@usdoj.gov
ashley.kaino-allen@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>TORENCE IVY HATCH,<br>  aka "Torrence Ivy Hatch,"<br>  aka "Boosie,"<br>  aka "Lil Boosie,"<br>  aka "Boosie Badazz,"<br><br>       Defendant. | Case No. 24CR1508-CAB<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO:<br> 1) Dismiss Count 1 under Double Jeopardy and Collateral Estoppel Violation; and<br> 2) Dismiss Count 2 for Vindictive Prosecution<br><br>Date: August 30, 2024<br>Time: 10:30 a.m. |

I

### INTRODUCTION

Defendant TORENCE IVY HATCH has never been put in jeopardy on the 922(g)(1) charge, as no findings of fact were ever made. No briefing schedule was ever set on HATCH's *Duarte* motion and therefore the United States never "self-deprived"[1] itself of an opportunity to respond. Similarly, there is no

---

[1]    ECF 17-1 (Def. Mot. to Dismiss Count 1) at 6:19.

1  vindictiveness based on the timing and circumstances of
2  HATCH's case and the felon-in-possession legal landscape.

3                                II

4                      STATEMENT OF FACTS

5       On May 6, 2023, a San Diego Police Department (SDPD)
6  Officer working in an undercover capacity, was conducting
7  intelligence gathering while using the social media platform,
8  Instagram.  The officer viewed a publicly available Instagram
9  account with the handle, "kp2_marketmade."  The officer
10 identified the user of the Instagram handle,
11 "kp2_marketmade," as A.D., who is a known Neighborhood Crip
12 gang member.  The Instagram handle had posted a story of an
13 unidentified male wearing red pants and a white t-shirt,
14 filming a music video in what appeared to be a backyard of a
15 residence.  The unidentified male had a black handgun, with
16 its grip, back strap, hammer, and rear sight visible, tucked
17 into his back waistband of his pants. A user's profile was
18 tagged in the story of "kp2_marketmade," utilizing the handle
19 of "mamaheliveagain2.0".  Upon review of the profile
20 "mamaheliveagain2.0", the officer recognized the male as "Lil
21 Boosie" or "Boosie Badazz," later identified as Defendant
22 TORENCE IVY HATCH ("HATCH" or "Defendant").

23      At the time of review, "mamaheliveagain2.0" had a live
24 "story" currently taking place.  The officer watched and
25 recorded the live story. While watching the live story, the
26 officer observed the "49th street" sign in the background and
27 heard an unknown male exclaim that they were live on the
28 streets of San Diego.  Following the review of the Instagram

stories, the SDPD officer requested the Airborne Law Enforcement Unit (ABLE) fly over the area of 4900 Guymon St. Based upon the physical description provided by the SDPD officer, ABLE was able to locate HATCH and shortly after, observed HATCH and two other unidentified males enter a black Mercedes SUV bearing California license plate 8NGG925. At the same time, SDPD officers in full police uniform and driving marked police vehicles, were conducting saturation patrol in the area of Chollas View in San Diego, CA. Shortly thereafter, officers observed the driver of the black Mercedes talking on his cellphone as he was driving southbound on Euclid Avenue towards Market Street. As SDPD units were driving east bound on 4700 Market Street, they observed the driver of the same Mercedes SUV fail to stop at a red stop signal while making a westbound turn onto 4700 Market Street. Ariel surveillance revealed the Mercedes did not stop anywhere from the time it departed 49th Street until stopped by the SDPD.

SDPD officers then attempted to conduct a traffic stop on the black Mercedes SUV, but the vehicle failed to yield and continued west bound on Market Street. The vehicle continued to drive slowly for approximately one block before coming to a complete stop. Prior to the vehicle coming to a complete stop, SDPD officers observed the rear passengers move side to side. Based on the officers' experience when they see individuals who continue to drive at a slow rate of speed while police are attempting to conduct a traffic stop,

they are frequently attempting to conceal firearms or other illegal contraband.

After the Mercedes finally yielded and upon approaching the vehicle, the officers observed three males in the vehicle, a driver and two rear seat occupants. HATCH was later identified as the rear passenger side occupant. HATCH identified the other occupant as his "security." The "security guard" was later identified as B.R.J. Based on the officers' observations while attempting pull over the Mercedes and for safety purposes, the officers asked the occupants if there were any weapons on their persons or inside the vehicle. HATCH claimed he did not have any weapons but that his security guard did. When asked where his weapon was located, B.R.J. pointed down towards a black satchel bag worn across his upper body. Officers removed the satchel, asked B.R.J. to step out of the vehicle and then placed him in handcuffs. Officers then asked HATCH and the driver to step out of the vehicle and placed both HATCH and the driver in handcuffs.

During a search of B.R.J.'s black satchel, officers located the following: a black and purple HS Produkt Hellcat model, 9mm pistol bearing serial number BB329274, and a magazine containing seven 9mm rounds inserted into the magazine well of the firearm and one round in the chamber.

During a search of the vehicle, officers located another loaded firearm, a black Glock, model 19, 9mm pistol, bearing serial number BXPZ813, with a magazine containing nine 9mm rounds inserted into the magazine well of the firearm and one

9mm round in the chamber, on the rear passenger seat between where B.R.J. and HATCH were seated. Furthermore, a Glock gun box was located on the rear floorboard behind driver's seat. Officers also located a marijuana joint in the center console of the vehicle.

Neither firearm was manufactured in California, and therefore, had traveled in and affected interstate commerce when it arrived in the State of California. An examination of the Glock revealed it to be the same weapon pictured in HATCH's rear waistband of his red pants, as seen on and later uploaded to YouTube video, in the minutes before he entered the Mercedes and was stopped by the SDPD.

All three occupants were transported to SDPD Headquarters for further processing, investigation, and interviews. After HATCH was interviewed by detectives, he was returned to a parked police vehicle and B.R.J. was in a separate nearby police vehicle at San Diego Police Department headquarters. HATCH was heard yelling and berating B.R.J. for telling the police that the gun was on the seat. HATCH yelled at B.R.J. and asked why B.R.J. told the detective the gun was on the seat was his. SDPD officers heard HATCH tell B.R.J., "you told me they were in the bag." Officers overheard HATCH threaten B.R.J. for not taking responsibility for the guns. Two officers overheard HATCH tell B.R.J., his security guard, that "you're gonna be in a body bag." Another officer overheard HATCH tell him something along the lines of "I got ten on your head" or "I got 10k on you."

1    Records check revealed HATCH was a convicted felon,
2  having been convicted of bringing illegal contraband to and
3  from a penal institution, criminal conspiracy to incite a
4  felony, and possession of a controlled substance with intent
5  to distribute, serving more than a year in custody.

6    During an interview with SDPD officers, HATCH admitted
7  that there was a marijuana smell in the vehicle and that he
8  was rolling a "blunt" before the vehicle was pulled over.
9  HATCH was seen on camera in the Instagram story smoking a
10 marijuana joint.

11    Firearms transfer records revealed the seized firearms
12 were purchased by an intimate associate of HATCH on December
13 15 and 21, 2022, from an Atlanta area federal firearms dealer
14 ("FFL"). The Glock found in the vehicle and seen earlier
15 tucked in HATCH's waistband was purchased on December 21.
16 The Hellcat in B.R.J. crossbody satchel was purchased on
17 December 15. For each purchase, HATCH's intimate associate
18 provided a Georgia Driver's License and listed an address in
19 Fairburn, GA.

20    Furthermore, earlier on May 6, 2023, HATCH and B.R.J.
21 flew from Atlanta Hartsfield-Jackson International Airport to
22 San Diego International Airport on Delta Flight number 894.
23 The Delta Flight records revealed HATCH's intimate associate
24 purchased the flight tickets for both HATCH and B.R.J. on May
25 5, 2023, and May 6, 2023, respectively. HATCH's intimate
26 associate purchased the tickets using a credit card and listed
27 an email address associated with HATCH's intimate associate
28 for receipt of the purchase. Additionally, according to Delta

Flight records, B.R.J. claimed "shooting equipment" in his checked luggage.[2]

At the time of arrest, HATCH claimed that the firearms belonged to B.R.J.  However, in a podcast episode released after HATCH's arrest, Hatch explained what happens if he is pulled over and police find a weapon in the vehicle.  HATCH said that "this happens plenty of times" and another occupant of the vehicle "will say it's his [not HATCH's] guns when they come to the car.  That's what they do."

After HATCH's arrest, B.R.J. claimed that "his" girlfriend, HATCH's intimate associate, purchased the firearms.  B.R.J. also said that HATCH's intimate associate knows he [B.R.J.] has her registered guns.  B.R.J. then claimed that the firearms were purchased from a pawnshop in Georgia.

### III

### STATEMENT OF THE CASE

A.  GENERAL BACKGROUND

On June 21, 2023, a federal grand jury sitting in the Southern District of California returned an indictment ("first indictment") charging HATCH with Possession of a Firearm and Ammunition, in violation of Title 18, U.S.C., § 922(g)(1) in case number 23-cr-1201-CAB.  Various issues were presented before the Court including Defendant's motion to dismiss under the second amendment, which the Court denied on

---

[2]   On at least one prior occasion when HATCH did not travel with "security" but instead travelled with his intimate associate, the intimate associate is on record for checking firearms as luggage for the plane trip.

August 7, 2023, and Defendant's motion to suppress statements, which was briefed and pending determination by the Court. ECF 43, 61, 64.

　　B.　*DUARTE* OPINION AND STATUS HEARINGS

　　On May 9, 2024, a divided three-judge Ninth Circuit panel held that 18 U.S.C. § 922(g)(1)'s prohibition on firearm possession by felons was unconstitutional as applied to a defendant with prior felony convictions for vandalism, possession of a firearm by a felon, possession of a controlled substance for sale, and evading a police officer. *United States v. Duarte*, 101 F.4th 657 (9th Cir.), *reh'g en banc* granted, opinion vacated, 108 F.4th 786 (9th Cir. 2024). The very next day, the parties appeared for a previously scheduled status hearing, discussed *Duarte* and whether it would be taken *en banc*, other pending decisions, and next steps for HATCH's case in the interim. Ex. 1 (May 10, 2024 Status Hearing transcript). Defendant was told to file a renewed motion to dismiss the indictment under the second amendment pursuant to *Duarte*, the United States was not required to file a response to the anticipated *Duarte* motion at that time, and another status hearing was set for July 12. *Id.* at 3:7–3:12, 6:5–6:18. The corresponding minute entry for the proceedings included the following:

> In light of the Ninth Circuit decision in Duarte, the court will not rule on the pending motions and will not set briefing and trial schedules until final ruling. Further Status Hearing set for 7/12/2024 10:30 AM in Courtroom 15A before Judge Cathy Ann Bencivengo.

ECF 77.

Ahead of the next hearing, Defendant filed the renewed motion under *Duarte* on June 3, ECF 79, and emailed with United States on July 8 about a continuance because the petition for *en banc* review of *Duarte* was still pending.   On July 11, Defendant lodged a district order from the Central District of California dismissing a defendant's § 922(g)(1) charge. The parties appeared before the Court the next day on July 12. ECF 81, 83.

At the July 12 status hearing, the Court referenced the current state of the *Duarte* decision and the Defendant's pending *Duarte* motion, which the United States had not responded to given discussions at the previous hearing.   Ex. 2 (July 12, 2024 Status Hearing transcript).   *See* Ex. 1, ECF 77.   Stand in counsel for the assigned Assistant United States Attorneys informed the Court about its belief this would be another continuance, but also raised the Ninth Circuit's writ of mandamus denial in *United States v. Dotson*, 22CR1502-W, ECF 66 and 74, where Dotson sought the Ninth Circuit to apply *Duarte* to his § 922(g)(1) case. Ex. 2 at 3:3-3:13. Based on the discussions, the United States requested time to file briefing, which was denied.   *Id.* at 3:14-3:20. Here, the Court dismissed HATCH's case citing the *Duarte* panel opinion and stated that the United States failed to respond to Defendant's *Duarte* motion.[3]   *Id.* at 3:19-4:4.   The Court signed the order

---

[3] Defense Counsel, who was present at both status hearings, neglected to remind the Court that the United States was not required to respond before it declared the dismissal. *See* Ex. 2, ECF 77.

of dismissal on Friday, July 12, which released it of jurisdiction over this case.

C. *DUARTE EN BANC* REVIEW GRANTED, HATCH'S RE-INDICTMENT, AND DEFENDANT'S MOTIONS TO DISMISS

The United States received transcripts for the status hearings and, while preparing its appeal, the Ninth Circuit granted *en banc* review of *Duarte* within five days of Defendant's dismissal on Wednesday, July 17. On Friday, July 19, a federal grand jury returned an indictment ("second indictment") charging HATCH with Possession of a Firearm and Ammunition and Unlawful User/Addict in Possession of Firearm and Ammunition, in violation of Title 18, U.S.C., § 922(g)(1) and (g)(3) in case number 24-cr-01508-CAB. On August 18, Defendant filed a motion to dismiss count one due to double jeopardy and collateral estoppel and a motion to dismiss count two for vindictive prosecution. This response follows.

IV

ARGUMENT

A. DEFENDANT'S MOTION TO DISMISS BASED ON DOUBLE JEOPARDY SHOULD BE DENIED

"The Double Jeopardy Clause, applied to the States through the Fourteenth Amendment, provides that no person may be tried more than once 'for the same offence." *Currier v. Virginia*, 585 U.S. 493, 498 (2018). As the United States Supreme Court has held, this guarantee recognizes "the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they

secure the convictions they seek." *Id*. As the Supreme Court explained:

> Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy.

*Serfass v. United States*, 420 U.S. 377, 388 (1975).

While jeopardy can sometimes attach to motions to dismiss, the circumstances are rare. Specifically, "jeopardy only attaches when the court begins to hear evidence for the purpose of deciding the issue of guilt or innocence that could subject the defendant to the risk that he would be found guilty." *United States v. Lusby*, 972 F.3d 1032, 1037 (9th Cir. 2020) (cleaned up).

In *Lusby*, the Ninth Circuit held that jeopardy did not attach because the court did not hear evidence to decide guilt or innocence; instead, the proceedings "were held in response to [defendant's] motion seeking dismissal before trial based on . . . 'pure questions of law'" and the court ruled "without 'receiving and evaluating evidence and applying it to the question of guilt or innocence.'" *Id.* at 1037-38. As in *Lusby*, because HATCH was "never subjected to the risk that he would be found guilty" by this Court's consideration of the motion to dismiss, jeopardy did not attach to the Court's dismissal order. *Id.* at 1038 (cleaned up).

As an initial matter, here, the Court considered *no* facts of the case before summarily dismissing the second indictment. But even if it had, HATCH was at no risk of being

found guilty based on the Court's consideration of the facts
contained in Defendant's motion to dismiss.  Instead, he was
*only* at risk of the case against him continuing, not being
found guilty of the crime; the latter is the relevant
touchpoint.  As such, Defendant's motion should be denied.[4]
//
//

---

[4]  Defendant's cited cases are inapposite. As the Ninth
Circuit noted in *Lusby*, "*Hill* and *Patrick* stand for the
proposition that jeopardy may attach where there are no
genuine issues of fact and a dispute over whether to dismiss
the indictment is capable of being decided as a matter of law
because, under those conditions, the defendant can be at risk
of being found guilty based on the district court's
application of the law to those undisputed facts." *Id.* at
1041 (discussing *United States v. Hill,* 473 F.2d 759 (9th
Cir. 1972) and *United States v. Patrick*, 532 F.2d 142 (9th
Cir. 1976)).  As outlined above, unlike the defendants in
*Hill* and *Patrick*, Defendant was only ever at risk of his case
continuing to trial; not of the Court making findings of fact
that would have rendered him guilty if found by the ultimate
fact-finder (*e.g.*, that he was a felon or knowingly possessed
the at-issue firearm).
     *Patterson* and *Baptiste* also are inapposite. *Patterson*
involved a government motion, objected to by defendant, to
set aside a plea agreement after the district court had
accepted it. 381 F.3d 859 (9th Cir. 2004). In holding that
jeopardy attached, the Ninth Circuit acknowledged that,
"[j]eopardy ordinarily attaches when the court accepts a plea
of guilty[,]" and, as such, the "district court did not have
authority to vacate the plea over Patterson's objections."
*Id.* at 864-65.  This case does not implicate such facts.
Similarly, the *Baptiste* court found that jeopardy attached
where defendant was acquitted after a bench trial because the
"Double Jeopardy Clause bars appeal from a judgment of
acquittal."  *United States v. Baptiste*, 832 F.2d 1173, 1175
(9th Cir. 1987).  These facts also are not at issue here.

B.   COLLATERAL ESTOPPEL IS INAPPLICABLE

Next, HATCH claims the United States "self-deprived" itself of an opportunity to respond to the *Duarte* motion and believes the issue has somehow been precluded. *See* ECF 17-1. He is simply wrong because collateral estoppel applies when an issue of ultimate fact has once been determined by a final judgment, which prevents that issue from being litigated again between the same parties in any future lawsuit. *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Originally a civil doctrine, it was first applied in a criminal case in *United States v. Oppenheimer*, 242 U.S. 85 (1916). HATCH incorrectly relies upon *Harris v. Washington* for the proposition that issues do not need to be fully and fairly litigated, only that they be litigated. 404 U.S. 55 (1971). What he neglects to say is that, in *Harris*, the State conceded that the ultimate issue of identity was decided by the jury. *Id.* at 56. Here, there is neither a jury determination or a concession that the issue of "ultimate fact has once been determined by a valid and final judgment . . . ." *Id.; see also Ashe v. Swenson*, 397 U.S. at 443. No evidence was ever submitted to a jury and the issues were never determined by a valid and final judgment. No briefing schedule was set after HATCH filed his anticipated *Duarte* motion; instead, the Court set the matter for a status. As the Court and parties waited on the Ninth Circuit's decision on the government's *en banc* petition, the United States was not required to respond to Defendant's *Duarte* motion. Now that the panel decision in *Duarte* has been withdrawn pending

1  further review, it is more apparent that Court's original
2  denial of HATCH's *Bruen* motion was correct.

3      C. <u>THE VINDICTIVE PROSECUTION MOTION SHOULD BE DENIED</u>

4      The doctrine of vindictive prosecution rests on the
5  principle that defendants "may not be punished for exercising
6  a protected statutory or constitutional right." *United*
7  *States v. Goodwin*, 457 U.S. 368, 372 (1982). "Absent direct
8  evidence of an expressed hostility or threat to the defendant
9  for having exercised a constitutional right," such as the
10 case here, HATCH must put forward facts "that give rise to an
11 appearance of vindictiveness" satisfying "the presumption of
12 vindictiveness doctrine[.]" United *States v. Gallegos-Curiel*,
13 681 F.2d 1164, 1168 (9th Cir. 1982) (Kennedy, J.).  If he
14 does, the burden shifts to the prosecution team to demonstrate
15 that the allegedly punitive action "was justified by
16 independent reasons or intervening circumstances that dispel
17 the appearance of vindictiveness."  *Id*.

18     "The severe presumption should not be invoked lightly."
19 *Id.* at 1171.  Due process "is not offended by all
20 possibilities of increased punishment[.]" *Blackledge v.*
21 *Perry*, 417 U.S. 21, 27 (1974).  Importantly, "[t]he
22 presumption applies only to the extent it reflects the very
23 real likelihood of actual vindictiveness." *Gallegos-Curiel*,
24 at 1167.  As such, "[a] careful examination of whether an
25 appearance is raised is generally essential to prevent
26 wasteful delays of trial and to screen out frivolous
27 vindictive prosecution claims." *Id.* at 1171.  A careful

28

examination of the facts here reflects that Defendant has failed to raise the presumption.

    1.   *The Doctrine Does Not Apply*

    "[T]he doctrine of vindictive prosecution does not apply, when, as here, there has been no increase in the severity of the charge or the sentence imposed." *United States v. Kinsey*, 994 F.2d 699, 701 (9th Cir. 1993); *United States v. Rosales-Lopez*, 617 F.2d 1349, 1357 (9th Cir. 1980) ("Our circuit has refused to find the action of the prosecutor in reindicting a defendant vindictive where the charges contained in the second indictment expose the defendant to no greater risk of punishment than did those contained in the first indictment.").

    Defendant's motion fails because the second indictment does not increase the severity of the charges or sentence. The first indictment charged HATCH with being a felon in possession in violation of Title 18, U.S.C., § 922(g)(1), that exposed Defendant to a maximum 10 years in custody.  The second indictment also charges the same offense.  On these facts, the doctrine does not apply to Count 1.  *See United States v. Gresham*, No. 12-CR-00015-01-TMB, 2016 WL 7042111, at *9 (D. Alaska July 12, 2016) (unpublished) (vindictive prosecution doctrine inapplicable under *Kinsey* where the second indictment charged defendant with the same crimes as the first).

    Second, while the second indictment adds a charge against HATCH for being an unlawful user/addict in possession of a firearm in violation of Title 18, U.S.C., § 922(g)(3), that

charge carries the *same* maximum penalties as Count 1. Count 2 also groups with Count 1,[5] and both counts refer to the same sentencing guidelines. Under such facts, the doctrine also is inapplicable to Count 2. *See United States v. Dohm*, No. 94-0409, 1995 WL 460365, at *3 (9th Cir. Aug. 3, 1995) (unpublished) (additional charges not subject to vindictive prosecution doctrine where they grouped under the guidelines and the base offense level did not change); *United States v. Rosales-Lopez*, 617 F.2d 1349, 1357 (9th Cir. 1980) ("Our circuit has refused to find the action of the prosecutor in reindicting a defendant vindictive where the charges contained in the second indictment expose the defendant to no greater risk of punishment than did those contained in the first indictment.").

> 2. *Even if the Doctrine Does Apply, Defendant Fails to Allege Facts Sufficient to Raise the Presumption of Vindictiveness*

"The appearance of vindictiveness test is not a per se rule striking down any increased charge following any act by the defendant." *Gallegos-Curiel*, 681 F.3d at 1168. Instead, the presumption is "severe" and "should not be invoked lightly." *Id.* at 1171. As such, the presumption applies "only where, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights." *Id.* at 1169; *accord Goodwin*, 457 U.S. at 373 (due

---

[5] *See* Section 3D1.2.

to "severity" of presumption, it applies "only in cases in which a reasonable likelihood of vindictiveness exists").

The presumption of vindictiveness is particularly "rare" in the context here – when charges are added pretrial. *Gallegos-Curiel*, 682 F.2d at 1170 ("Departures from the initial indictment do not raise presumptions of vindictiveness except in a rare case."); *see also, e.g., United States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015) ("a defendant may, in rare instances, rely upon a presumption of vindictiveness"); *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001) (presumption of vindictiveness "will rarely, if ever, be applied to prosecutors' pretrial decisions").  Indeed, vindictiveness claims are "evaluated differently" when charges are added during pretrial proceedings.  *See United States v. Gamez-Orduño*, 235 F.3d 453, 462 (9th Cir. 2000)*; Gallegos-Curiel*, 682 F.2d at 1167 ("[C]ases involving increased charges or punishments after trial are to be sharply distinguished from cases in which the prosecution increases charges in the course of pretrial proceedings.").

The reasons are threefold.  First, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  As such, "[a] prosecutor should remain free before trial to exercise

the broad discretion entrusted to him . . . ." *Goodwin*, 457 U.S. at 382.

Second, in the pretrial context, several potential legitimate factors – e.g., new evidence, a new assessment of evidence, a desire to give defendants the chance first to resolve the case on the original charges – could explain the prosecutor's filing of additional charges. Thus, it is not possible to rationally exclude all potential (legitimate) explanations and infer or presume that animus or vindictiveness towards the defendant alone motivated additional, pretrial charges. *See, e.g., Goodwin*, 457 U.S. at 381-82. By contrast, "once a trial begins — and certainly by the time a conviction has been obtained – it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination . . . of the extent to which he should be prosecuted"; thus, "a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." *Id.* at 381.

Third, before trial, defendants routinely "burden" the prosecution with demands and motions, and so it "is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." *Id.* ("[D]efense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; . . . to be tried by jury. It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation

of procedural rights is an integral part of the adversary process in which our criminal justice system operates."); *Gallegos-Curiel*, 681 F.2d at 1169 ("The exercise of routine or clearly necessary defense motions in the pretrial stage does not meet the threshold for more detailed inquiry and does not suffice to raise the presumption of vindictiveness.").

Defendant's argument that the "severe" and "rare" presumption applies to the pretrial conduct here lacks merit, for at least three reasons.

First, as stated above, the charges in the second Indictment neither increased the severity of the initial charges nor Defendant's probable sentence if convicted. Even if the doctrine applies, however, this fact alone makes it both unrealistic and unlikely that the second indictment was obtained out of hostility or a punitive animus towards Defendant because he filed the motion to dismiss.

Second, circuit law holds that the fact "[t]hat the prosecution adds charges pretrial after a defendant asserts some right does not establish a presumption of vindictiveness." *United States v. Austin*, 902 F.2d 743, 745 (9th Cir. 1990). Yet the principal evidence Defendant cites in his motion to invoke this "severe" and "rare" presumption is limited to precisely that. *See* ECF No. 17-2 at 6 (". . . Mr. Hatch was charged with an additional felony after he successfully exercised his right to a renewed motion to dismiss[.]"). Moreover, in so arguing, Defendant ignores the Ninth Circuit's express admonishment that a "sequence of

events is not alone sufficient to raise an appearance of vindictive prosecution."[6] *Gallegos-Curiel*, 681 F.2d at 1169; *id.* at 1171 ("[a] sequence of events is not enough; the likelihood of retaliation is crucial" for the presumption to arise); *see also Goodwin*, 457 U.S. at 384 ("a mere opportunity for vindictiveness is insufficient"); *United States v. Ribota*, 792 F.3d 837, 842 (7th Cir. 2015) ("We have repeatedly held, however, that evidence of suspicious timing alone does not indicate prosecutorial animus . . . .").

Defendant's argument that the second indictment must have resulted from vindictiveness because it involves identical facts and the same questions of law that were at issue in the first Indictment also fares no better. While the facts may be the same, as outlined above, the Court cannot presume that

---

[6]    Defendant erroneously relies on *United States v. Groves*, 571 F.2d 450 (9th Cir. 1978), and *United States v. DeMarco*, 550 F.2d 1124 (9th Cir. 1977), opinions pre-dating the Supreme Court's 1982 decision in *Goodwin* and the Ninth Circuit's decision in *Gallegos-Curiel* (which expanded on *Goodwin*).

In *Goodwin*, the Supreme Court held that a defendant's demand for a jury trial on a misdemeanor offense – and subsequent indictment on a felony charge for the same conduct – was inadequate to trigger a presumption of prejudice. *Goodwin*, 457 U.S. at 383 ("The distinction between a bench trial and a jury trial does not compel a special presumption of prosecutorial vindictiveness whenever additional charges are brought after a jury is demanded."). More broadly, *Goodwin* held that "sequence of events is not alone sufficient to raise an appearance of vindictive prosecution." *Gallegos-Curiel*, 681 F.2d at 1169, 1171. Because *Groves* and *DeMarco* pre-dated *Goodwin*, they failed to take *Goodwin* into account, which decisively rejected the Ninth Circuit's approach in these cases.

charges added that relate to previously-known facts are charges resulting from vindictiveness as opposed to a new assessment of evidence or a desire to give a defendant the chance first to resolve the case on the original charges, both of which are common non-vindictiveness pretrial reasons for adding charges. Also, as to Defendant's claim that the law is the same, *Duarte* plainly changed the legal landscape relevant to HATCH's case, injecting uncertainty as to the constitutionality of the felon-in-possession charge that was not present when the original Indictment was sought.

Because Defendant fails to carry his burden to allege sufficient facts to invoke this severe and rare presumption, his motion should be denied.

3. *Even if the Presumption Applies, It is Rebutted*

Ninth Circuit law requires that, "[i]n every case alleging inferred vindictive prosecution, there must be a threshold showing of vindictiveness or the likelihood of it before the court is justified in inquiring into the prosecutor's actual motives." *See Gallegos-Curiel*, 681 F.2d at 1169. The United States does not believe that Defendant meets his burden; as such, the United States believes that denial of the motion is warranted and that it is not appropriate for the Court to inquire into the prosecution team's actual motives.

To the extent the presumption does apply, that only shifts the burden "to the prosecution to show that any

increase in the severity of the charges[7] did not stem from a vindictive motive, or was justified by independent reasons or intervening circumstances that dispel the appearance of vindictiveness." *Gallegos-Curiel*, 681 F.2d at 1168.  The prosecution team can make such a showing. In light of the changing landscape on firearms cases, the United States believed it would be prudent to include another valid alternative theory for guilt because HATCH is a prohibited person for numerous reasons.

V

CONCLUSION

The Court should deny HATCH's motions to dismiss.

Dated: August 23, 2024.          Respectfully submitted,

                                 TARA K. MCGRATH
                                 United States Attorney

                                 *Michael G. Wheat*

                                 *Ashley Kaino-Allen*
                                 MICHAEL G. WHEAT
                                 ASHLEY KAINO-ALLEN
                                 Assistant U.S. Attorneys

---

[7]   Again, there is no increase in the severity of the charges.

*USA'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS*                    *24cr1508-CAB*