MEGHAN BLANCO (238171)
LAW OFFICES OF MEGHAN BLANCO
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677
Telephone:  (949) 296-9869
Facsimile:  (949) 606-8988
E-mail:     mblanco@meghanblanco.com

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 24-CR-1508-CAB |
|---|---|
| Plaintiff, | SENTENCING POSITION |
| v. | |
| TORENCE HATCH, | |
| Defendant. | |

Defendant Torence Hatch, by and through his counsel of record, Meghan Blanco, files the attached sentencing memorandum. For the reasons stated below, Mr. Hatch respectfully urges the Court to sentence him to a two-year probationary term with community service.

This memorandum and Mr. Hatch's sentencing recommendation are based on the attached memorandum of points and authorities, the files in this case, and any other argument of information the Court wishes to hear at the sentencing hearing.

Respectfully Submitted,

Dated: January 4, 2026

                        *//s// Meghan Blanco*
                        MEGHAN BLANCO

## MEMORANDUM OF POINTS AND AUTHORITIES

A. Introduction

Mr. Hatch's life story is one of extraordinary adversity, resilience, and personal growth. He was born and raised in one of the most dangerous neighborhoods in Baton Rouge, Louisiana—an environment marked by violence, poverty, and instability. His father struggled with addiction and died when Mr. Hatch was just fourteen years old, a traumatic loss that permanently altered the course of his childhood and left him without meaningful adult guidance at a formative age.

Music became Mr. Hatch's primary means of survival and self-expression. From a young age, he used it to process grief, anger, and fear, and to articulate experiences shared by many young people growing up in similarly marginalized communities. Over time, that outlet became his profession. Through discipline and persistence, Mr. Hatch built a successful career that allowed him to support his family, create legitimate employment for others, and ultimately leave behind the environment that shaped his early years.

Importantly, Mr. Hatch's adult life reflects substantial maturation and law-abiding conduct. As the PSR confirms, there was an approximately ten-year gap between his prior criminal conduct and the instant offense. During that decade, Mr. Hatch focused on his career, his children, and community engagement. He did not reoffend, and he demonstrated that he was capable of living within the law notwithstanding the difficult circumstances of his upbringing.

Mr. Hatch has also used his success to give back to his communities. He has hosted annual food and holiday drives, supported families impacted by natural disasters, funded community events for underserved youth, and used his platform to speak directly to at-risk young people about avoiding the mistakes he made earlier in

life. His charitable efforts are not episodic or performative; they are consistent, hands-on, and rooted in personal understanding of hardship.

Mr. Hatch's life has also been marked by significant victimization, a factor that bears directly on his conduct and perspective. In November 2020, he was the victim of a shooting in Texas, an event that understandably heightened his sense of vulnerability and personal safety. That experience—combined with his public profile—has shaped his perception of risk while traveling, even as he now recognizes that his response in this case was misguided and unlawful.

Following his arrest in this matter, Mr. Hatch was again victimized—this time through the criminal justice system itself. In United States v. Medina, Case No. 24-CR-00248, Mr. Medina was convicted of attempting to extort Mr. Hatch by exploiting the publicity surrounding this case. Mr. Medina targeted Mr. Hatch, along with other high-profile defendants charged with relatively minor offenses, in an effort to extract money from them.

Despite these challenges, Mr. Hatch has responded appropriately since his arrest. He has complied fully with pretrial supervision, respected the authority of the Court, and accepted responsibility by pleading guilty. He has expressed genuine remorse, particularly with respect to the impact of this case on his children, whom he has worked hard to protect from the instability that defined his own upbringing.

In short, Mr. Hatch is not defined by the instant offense. He is a man who rose from extraordinary adversity, contributed meaningfully to his community, and has taken responsibility for a serious but isolated lapse in judgment. These history and characteristics strongly support a sentence that is individualized, proportional, and oriented toward continued rehabilitation rather than unnecessary incarceration.

//

//

B. Procedural History

Mr. Hatch was initially charged in state court arising out of the conduct at issue in this case. He was released on bond and appeared at every scheduled court proceeding, complied with all conditions of release, and conducted himself appropriately throughout the pendency of the state case.

After thoroughly reviewing the facts of the case and Mr. Hatch's personal history and characteristics, the presiding state court judge indicated a willingness to resolve the matter with a probationary disposition, reflecting the Court's assessment of both the limited nature of the offense conduct and Mr. Hatch's suitability for supervision in the community.

When Mr. Hatch and his counsel appeared in state court prepared to accept that disposition, the District Attorney dismissed the state charges. Immediately thereafter, federal agents arrested Mr. Hatch in the hallway of the courthouse and transferred him into federal custody.

Mr. Hatch was subsequently brought before this Court, where the then-assigned Assistant United States Attorney moved for detention. Mr. Hatch was initially placed on home confinement. The home confinement condition has since been removed, and Mr. Hatch has remained fully compliant with all court orders and has proceeded through the federal case without incident.

C. Offense Conduct

On May 6, 2023, Mr. Hatch was in San Diego for a brief, work-related visit connected to a paid music video shoot and an upcoming performance. He traveled with a small entourage that included a hired driver and a security guard. There is no allegation that Mr. Hatch traveled to California to engage in criminal activity, traffic firearms, or commit acts of violence.

Earlier that day, law enforcement became aware of a short social-media video clip associated with the music video shoot. During a portion of that recording, Mr. Hatch was momentarily seen with a firearm placed in his waistband as part of the visual staging of the shoot. No firearm was discharged, brandished toward any person, or used to threaten anyone.

Later that afternoon, officers conducted a traffic stop of the vehicle in which Mr. Hatch was a rear-seat passenger. The stop was not initiated in response to any report of violence or harm. Mr. Hatch complied with law enforcement and did not attempt to flee or resist. No individual was injured, and no victim was identified.

During the stop, officers recovered two firearms: one located in a satchel worn by the security guard and another on the rear seat of the vehicle. The firearms were lawfully purchased outside California and had been transported to San Diego by the security guard, who registered them with TSA. The government has not alleged that the firearms were used in connection with any other offense, nor that Mr. Hatch intended to use them for unlawful purposes. The incident occurred during a short visit, in a controlled setting, and was limited in scope and duration. The case represents an isolated lapse in judgment, not a pattern of ongoing criminal conduct.[1]

The government places significant weight on alleged statements purportedly made by Mr. Hatch at the precinct, characterizing them as evidence of dangerousness and violent propensity. That characterization is not supported by the contemporaneous record. What law enforcement actually documented at the time—and what officers did in response to Mr. Hatch's medical condition—materially undermines the government's reliance on these allegations.

---

[1] Certain language in the Presentence Report characterizes the offense using terms and associations not necessary to resolve the sentencing issues before the Court. The defense submits this reframed summary to ensure the offense conduct is evaluated based on objective facts rather than descriptors that risk overstating the nature or seriousness of the conduct.

      a. Contemporaneous Police Reports Do Not Document Threats

The initial police reports do not document threats of any kind. Rather, the contemporaneous narrative reflects a verbal exchange between Mr. Hatch and Mr. Johnson concerning the location of the firearms. Specifically, the report states that Mr. Hatch asked Mr. Johnson why he told officers the gun was on the seat; Mr. Johnson replied that he told detectives the firearms were his; and Mr. Hatch responded, "You told me they were in the bag." See Exhibit A at page 23.

That exchange constitutes the entirety of the documented interaction. There is no reference in the initial reports to threats, promises of violence, bounties, or any intent to harm anyone, including Mr. Johnson. The absence of such allegations in first-instance documentation is significant. Had the extreme threats later attributed to Mr. Hatch occurred, they would reasonably be expected to appear in contemporaneous police reports. They do not.

      b. No Audio or Video Evidence Corroborates the Alleged Statements

This absence is particularly notable because Mr. Hatch was being recorded during portions of his detention. Yet none of the alleged threats appear on any audio or video recording, despite functioning recording equipment and extensive documentation of other statements and conduct.

The government thus asks the Court to credit alleged statements that are unrecorded, absent from contemporaneous reports, and inconsistent with the documented narrative. Under these circumstances, the statements lack sufficient indicia of reliability to support aggravation at sentencing.

      c. Officers Declined to Provide Medical Care and Instead Collected
        Evidence

At the time of the traffic stop and subsequent detention, Mr. Hatch—who has Type I diabetes—was experiencing dangerously low blood sugar. He requested food

and medical assistance, and his entourage was actively traveling to obtain food because his physical condition was deteriorating. *See id.*

Law enforcement was aware of Mr. Hatch's diabetic condition and his worsening symptoms. An officer called in a Code 1141 (ambulance needed) after Mr. Hatch stated he was diabetic and deteriorating. *See id.* ("5/6/2023 15:44:12 7902 OPS41 — 1141 FOR A MALE SAYING HE IS DIABETIC.").

Hypoglycemia is known to cause confusion, agitation, impaired judgment, and emotional dysregulation, particularly when untreated. While in custody, Mr. Hatch repeatedly requested that his blood sugar be checked. Officers performed a finger-prick blood test; however, rather than provide treatment, food, or medication, they impounded the blood sample and submitted it for DNA testing. *See id.* ("A diabetic strip that belonged to Hatch was impounded as evidence under barcode #11446845.").

Mr. Hatch was not provided medical care. The police reports reflect that officers elected to retain the blood sample for evidentiary purposes rather than address his medical needs.

This sequence matters. It establishes that officers recognized Mr. Hatch was experiencing a medical issue, treated it as such in real time, and did not contemporaneously characterize his behavior as threatening or criminal in nature.[2]

   d.  The Court Should Decline to Recast a Medical Event as Aggravation

Sentencing must rest on reliable, contemporaneous information. The record reflects that Mr. Hatch was medically compromised, seeking food and medical assistance, and involved in a verbal disagreement regarding evidence—not making criminal threats.

---

[2] Unfortunately, Mr. Hatch's ability to recall the events with precision was compromised due to his serious and untreated medical condition following his arrest.

7

To treat this episode as aggravating would effectively transform a documented medical event into evidence of dangerousness. That result would be inconsistent with due process and the sentencing principles set forth in 18 U.S.C. § 3553(a).

### D. The § 3553(a) Factors Support a Sentence of Two Years' Probation With Community Service

A sentence of two years' probation, coupled with a meaningful community-service requirement, is sufficient but not greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a). Such a sentence appropriately balances accountability, deterrence, rehabilitation, and proportionality, while recognizing the substantial punishment Mr. Hatch has already endured.

1. Nature and Circumstances of the Offense (§ 3553(a)(1))

The offense conduct was limited, nonviolent, and isolated. Mr. Hatch did not discharge a firearm or cause harm. No victim was identified, and the government has not alleged that the firearms were used in connection with any other criminal activity or broader criminal scheme.

The conduct occurred during a brief, work-related visit to San Diego and reflects a lapse in judgment rather than ongoing criminal behavior. Section 3553(a) requires the Court to sentence based on the actual circumstances of the offense—not on hypothetical risks or overstated characterizations unsupported by the contemporaneous record.

To the extent the Court considers alleged statements attributed to Mr. Hatch at the precinct, those allegations should be weighed cautiously. They are unsupported by audio or video evidence, absent from contemporaneous police reports, and arose during a documented medical emergency involving untreated hypoglycemia. No charges were brought based on threats and no protective action was deemed necessary at the time.

Sentencing should rest on reliable conduct, not disputed characterizations of a medical episode.

2. History and Characteristics of the Defendant (§ 3553(a)(1))

Mr. Hatch's personal history strongly supports a probationary sentence. As reflected in the PSR, there was an approximately ten-year gap between his prior criminal conduct and the instant offense. During that period, he lived law-abidingly, raised his children, maintained employment, and engaged in sustained community support.

Since his arrest, Mr. Hatch has demonstrated that he is amenable to supervision. He complied with all court-ordered conditions, including nearly a full year of home confinement, without incident. He appeared as directed, followed supervision requirements, and accepted responsibility by pleading guilty. His conduct throughout this case confirms that the instant offense is an aberration, not a trajectory.

3. Sentence Must Reflect Real Punishment Already Imposed (§ 3553(a)(2)(A))

Mr. Hatch has already experienced significant punishment. He was subject to nearly one year of home confinement—a substantial deprivation of liberty that meaningfully restricted his movement, employment flexibility, and family life. Home confinement imposed continuous monitoring, limited travel and professional activity, and significantly constrained daily life. Courts routinely recognize such conditions as serious punishment, not a nominal sanction.

Under § 3553(a), that already-served punishment must be weighed in determining whether additional incarceration would be greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. Imposing custody on top of that sanction would risk excess rather than proportionality.

//

4.  Deterrence and Protection of the Public (§ 3553(a)(2)(B)–(C))

The goals of deterrence and public safety are fully satisfied without incarceration. Specific deterrence is demonstrated by Mr. Hatch's post-arrest conduct. He has complied with supervision, avoided new violations, and taken concrete steps to ensure this conduct does not recur.

General deterrence is achieved through the public nature of this case, the federal prosecution itself, prolonged supervision, and nearly a year of home confinement. Additional incarceration would provide little incremental deterrent value.

While Mr. Hatch has previously served lengthy custodial sentences, the record reflects that those sentences were followed by a substantial period of lawful conduct, family stability, and professional success. Deterrence is not measured by perfection, but by whether a defendant meaningfully altered his life trajectory—which Mr. Hatch did for many years. The instant offense represents a lapse in judgment, not a rejection of deterrence or a return to entrenched criminal conduct.

Nothing in the record suggests that Mr. Hatch poses a risk to the public, and his conduct since arrest demonstrates stability, compliance, and accountability.

5.  Rehabilitation Is Best Served Through Structured Supervision and Community Service (§ 3553(a)(2)(D))

Probation allows the Court to impose structure, accountability, and continued oversight while permitting Mr. Hatch to remain a productive member of the community and a stable presence for his children.

Concerns that Mr. Hatch's profession exposes him to risk can be addressed through structured supervision rather than incarceration. Since his arrest, Mr. Hatch has complied with firearm prohibitions and demonstrated that he can conduct his work within the bounds of supervision. Probation, combined with explicit conditions and community service, directly mitigates the risks identified in the PSR.

As a condition of probation, Mr. Hatch respectfully proposes a substantial community-service requirement focused on underserved communities and youth outreach. He has a demonstrated history of hands-on community involvement, including food drives, disaster-relief support, and youth engagement. Formalizing that work through court-ordered community service converts punishment into tangible public benefit.

Community service is particularly appropriate here because it:

- reinforces accountability;
- promotes rehabilitation rather than disruption;
- directly benefits the community; and
- aligns with Mr. Hatch's demonstrated capacity to contribute constructively.

Continued supervision in the community also ensures access to appropriate medical care for Mr. Hatch's Type I diabetes—an important consideration given the medical complications documented in this case.

6. Avoiding Unwarranted Sentencing Disparities (§ 3553(a)(6))

A probationary sentence with community service avoids unwarranted sentencing disparities. The state court that initially reviewed this matter indicated a willingness to resolve the case with probation, reflecting a reasoned assessment of both the offense conduct and Mr. Hatch's suitability for supervision. While this Court exercises independent judgment, that assessment underscores that probation is a proportionate outcome for this conduct.

As a condition of probation, Mr. Hatch is prepared to complete no fewer than 300 hours of community service, focused on underserved communities, youth mentorship, and food insecurity. Formalizing this obligation ensures accountability while advancing the rehabilitative goals of § 3553(a).

E.  Conclusion

For the foregoing reasons, Mr. Hatch respectfully urges the court to sentence him to a two-year probationary term with community service.

Respectfully Submitted,

Dated: January 4, 2026

   //s// Meghan Blanco

MEGHAN BLANCO
COUNSEL FOR DEFENDANT HATCH